UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ASHLEY A. DYER,

                Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

13-CV-6312P


## <u>PRELIMINARY STATEMENT</u>

Plaintiff Ashley A. Dyer ("Dyer") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 10). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

# BACKGROUND

## I.      Procedural Background

Dyer protectively filed for SSI/DIB on March 3, 2010, alleging disability beginning on December 4, 2009, as a result of traumatic brain injury, kidney problems and high blood pressure.  (Tr. 144, 149).[1]  On May 15, 2010, the Social Security Administration denied both of Dyer's claims for benefits, finding that she was not disabled.  (Tr. 67-68).  Dyer requested and was granted a hearing before Administrative Law Judge F. Patrick Flanagan (the "ALJ").  (Tr. 89-90, 99-103).  The ALJ conducted a hearing on July 20, 2011.  (Tr. 34-66).  Dyer was represented at the hearing by her attorney, Robert Noble, Esq.  (Tr. 34, 120).  In a decision dated October 21, 2011, the ALJ found that Dyer was not disabled and was not entitled to benefits.  (Tr. 18-27).

On April 19, 2013, the Appeals Council denied Dyer's request for review of the ALJ's decision.  (Tr. 1-4).  Dyer commenced this action on June 18, 2013, seeking review of the Commissioner's decision.  (Docket # 1).

## II.      Relevant Medical Evidence[2]

### A.      Medical Records

#### 1.      School Psychologist Report

On February 10, 1997, school psychologist H. Lynne Collins ("Collins"), PhD, conducted a psychological examination of Dyer.[3]  (Tr. 538-40).  The report indicates that Dyer

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Dyer does not challenge the ALJ's physical Residual Functional Capacity ("RFC") assessment.  Thus, records pertaining to Dyer's physical impairments are not summarized herein.

[3]  In addition to the psychologist's report, the record contains some of Dyer's school records, which have been reviewed but are not summarized herein.  (Tr. 205-68).

was initially referred for evaluation by her pre-first grade teacher, who expressed concerns

regarding Dyer's concept and academic development and her impulsivity and distractibility.

(*Id.*).  Dyer had been diagnosed with a bilateral Wilms tumor when she was five months old.

(*Id.*).  A comprehensive psychological evaluation was conducted in 1991, and the Committee for

Special Education ("CSE") classified Dyer as "multiply handicapped" and placed her into a 15:1

classroom.  (*Id.*).  In 1994, Dyer was re-evaluated and assessed to have a Verbal Scale

Intelligence Quotient ("IQ") of 65, a Performance Scale IQ of 66 and a Full Scale IQ of 63.

(*Id.*).  The results of the February 1997 testing demonstrated that Dyer had a Verbal Scale IQ of

59, a Performance Scale IQ of 72 and a Full Scale IQ of 63.  (*Id.*).

## 2.    University of Rochester Medical Center

Treatment notes indicate that Dyer received treatment at the Pediatric Hematology

and Oncology Department of the University of Rochester Medical Center ("URMC") for over

twenty years.  (Tr. 386-87).  According to the records, Dyer was diagnosed with a bilateral

Wilms tumor (cancer of the kidney) when she was five months old.  (*Id.*).  Her left kidney was

removed and she was treated with chemotherapy.  (*Id.*).  During the course of her treatment, in

May 1986, Dyer suffered a cardiopulmonary arrest lasting approximately seventeen minutes.

(*Id.*).  The cardiac arrest led to anoxia of the brain and accompanying neurocognitive damage.

(*Id.*).  Since that time, Dyer has been monitored at URMC for recurrence of cancer and provided

referrals and guidance for medical and cognitive issues.  (*Id.*).

On September 22, 2004, Dyer was evaluated at URMC by Andrea S. Hinkle

("Hinkle"), MD.  (Tr. 296-98).  Treatment notes indicate that Dyer had recently graduated from

school with an IEP diploma and had been volunteering in childcare at the YMCA.  (*Id.*).  Dyer

reported that she was involved in a long-term monogamous relationship and was interested in

finding employment.  (*Id.*).  She indicated that she had been in touch with the VESID program, but had not been contacted regarding job placement.  (*Id.*).  Upon examination, Hinkle noted neurocognitive limitations.  (*Id.*).  Dyer also met with the educational liaison, Kathy Wissler ("Wissler"), who indicated that she would assist Dyer in communicating with VESID to facilitate job training and employment placement.  (*Id.*).

Dyer returned for an evaluation by Hinkle on September 3, 2005.  (Tr. 293-95). Dyer reported that she had been working at a hotel performing housekeeping and laundry tasks during the previous year.  (*Id.*).  She stated that she worked forty hours a week and enjoyed her employment, but indicated that it provided minimal benefits and she was looking for other employment.  (*Id.*).  According to Dyer, she lived with her mother and stepfather and socialized with her friends.  (*Id.*).  According to Hinkle, Dyer demonstrated a successful work record, but needed to obtain insurance benefits.  (*Id.*).

On March 28, 2007, Dyer returned to URMC for an evaluation by Olle Jane Z. Sahler ("Sahler"), MD.  (Tr. 291-92).  She reported that she lived with her mother, stepfather and younger sister and was currently employed at a loan service company.  (*Id.*).  Sahler opined that Dyer's medical issues appeared stable, with the exception of her hypertension and possible hematuria.  (*Id.*).

The following year, on March 26, 2008, Dyer attended a monitoring appointment with Sahler.  (Tr. 289-90).  Dyer continued to live with her mother, stepfather and sister and was still employed by the loan service company.  (*Id.*).  Again, Sahler noted that Dyer's medical issues appeared stable, with the exception of hypertension, potential hematuria and an increased creatinine level.  (*Id.*).

B.     **Medical Opinion Evidence**

1.     **Sara Long, PhD**

On May 6, 2010, state examiner Sara Long ("Long"), PhD, conducted a consultative psychiatric evaluation of Dyer.  (Tr. 341-44).  Dyer reported that she lives with her mother and stepfather and was driven to the evaluation by her grandfather.  (*Id.*).  She reported she had graduated from high school with an IEP diploma and had attended special education classes and BOCES training in graphic communications.  (*Id.*).  Dyer indicated that she had worked at her previous employment for ten months and, although she had been performing her job adequately, her employment had been terminated because she was unable to pass the company's test after several attempts.  (*Id.*).

According to Long, medical records indicated that Dyer had been diagnosed with kidney cancer when she was five months old and had been classified as having a traumatic brain injury.  (*Id.*).  Dyer reported that she was able to care for her own personal hygiene and was able to cook, clean, do laundry and shop, although she reported difficulty with calculating change. (*Id.*).

Upon examination, Long noted that Dyer appeared appropriately dressed and well-groomed, with normal gait, motor behavior and eye contact.  (*Id.*).  Long opined that Dyer had fluent, clear speech with adequate language, coherent and goal-directed thought processes, euthymic mood, full range affect, clear sensorium and full orientation.  (*Id.*).  Long opined that she appeared to be functioning on an extremely low intellectual level with a limited fund of information.  (*Id.*).  According to Long, Dyer's childhood intelligence scores demonstrated that she had a Full Scale IQ of 63 and that her visual-perceptual skills placed her at a five-year-old level when she was nine years old.  (*Id.*).  With respect to her attention and concentration, Long

noted that Dyer was unable to subtract three from twenty-seven.  (*Id.*).  According to Long, Dyer could recall three objects immediately and one out of three objects after five minutes, and she could complete five digits forward and two back.  (*Id.*).

According to Long, Dyer could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration and maintain a regular schedule.  (*Id.*).  According to Long, Dyer may have some limitations learning new tasks, performing complex tasks independently and making appropriate decisions.  (*Id.*).  Long further opined that Dyer appeared to relate adequately with others and to have adequate stress management.  (*Id.*).  According to Long, the examination suggested that she suffered from cognitive problems that appeared to interfere with her ability to function on a regular basis.  (*Id.*).  Dyer reported that she was able to learn tasks if they were demonstrated, but had difficulty with verbal explanations.  (*Id.*).  Long suggested that Dyer's difficulty was not in securing employment, but in retaining employment without appropriate accommodations.  (*Id.*).

Long opined that Dyer would be appropriate for a sheltered workshop or a job coach and suggested training through VESID.  (*Id.*).  According to Long, Dyer's prognosis was good with vocational evaluation and ongoing counseling.  (*Id.*).

On August 18, 2011, Long conducted an intelligence evaluation of Dyer.  (Tr. 553-58).  According to Long, testing demonstrated that Dyer had a Full Scale IQ of 71 and could read at a fourth grade level.  (*Id.*).  According to Long, her IQ scores were two points above an extremely low level, but compared with her childhood scores, demonstrated that her functioning had improved over time.  (*Id.*).  Long observed that Dyer exhibited stress while performing tasks over time, likely as a result of cognitive fatigue or challenge.  (*Id.*).

On that same date, Long conducted another psychiatric evaluation of Dyer. (Tr. 548-52). Dyer reported that she continued to live with her mother and stepfather and was driven to the evaluation by her mother. (*Id.*). She reported that she was working part-time in a fitting room without any problems. (*Id.*). According to Dyer, she enjoyed working, but thought it would be difficult to work on a full-time basis. (*Id.*). Again, she reported that she was able to care for her personal hygiene, cook, do laundry and shop. (*Id.*).

Upon examination, Long noted that Dyer appeared appropriately dressed and well-groomed, with normal gait, motor behavior and eye contact. (*Id.*). Long opined that Dyer had fluent, clear speech with adequate language, coherent and goal-directed thought processes, euthymic mood, full range affect, clear sensorium and full orientation. (*Id.*). Long opined that she appeared to be functioning at a borderline intellectual level, approximately two points above the extremely low range. (*Id.*). According to Long, Dyer could read at a fourth grade level. (*Id.*). With respect to Dyer's attention and concentration, Long noted that she was unable to subtract three from twenty. (*Id.*). According to Long, she could recall three objects immediately and three out of three objects after five minutes, and she could complete five digits forward and three back. (*Id.*).

According to Long, Dyer could follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, maintain a regular schedule and learn some new tasks. (*Id.*). According to Long, Dyer might have some limitations performing complex tasks and making appropriate decisions. (*Id.*). Long further opined that she appeared to relate adequately with others and to have adequate stress management, although Long noted that testing revealed that her functioning tended to deteriorate over time, suggesting that her stress threshold would decrease with stress and over time. (*Id.*).

According to Long, the examination suggested that Dyer suffered from cognitive problems that appeared to interfere with her ability to function on a regular basis. (*Id.*). Dyer indicated that she can manage at work, but gets frustrated with her ability to comprehend. (*Id.*). Long noted that Dyer had scored in the borderline intellectual level with the majority of her "sub scores" falling in the borderline to low average range. (*Id.*). Long also noted that her cognitive functioning was tested over a limited time period. (*Id.*). According to Long, the impact of the injury to Dyer's brain apparently related primarily to the frontal lobe functions and processing, suggesting that her processing breaks down over time and with stress. (*Id.*). Long opined that these observations were consistent with Dyer's report that she would have difficulty working longer hours, even for a job that she currently performs on a part-time basis. (*Id.*). Long suggested that her observations were also consistent with concerns raised by URMC that Dyer might suffer impairments in her executive functioning. (*Id.*).

Long diagnosed Dyer with a reading, spatial ability and perceptual organization learning disability and did not rule out organicity. (*Id.*). Long recommended that Dyer continue to work on a part-time basis, and that she consider additional education, training, stress management and psychotherapy. (*Id.*). Long opined that Dyer's prognosis for maintaining her current level of general and vocational functioning was good, but that her functioning could be negatively impacted by increased stress, work volume and health issues. (*Id.*).

Long also completed a medical source statement assessing Dyer's mental ability to do work-related activities. (Tr. 559-61). According to Long, Dyer had no limitations in her ability to understand, remember and carry out simple instructions, make judgments on simple work-related decisions, and interact appropriately with the public, supervisors and coworkers. (*Id.*). Long assessed that Dyer suffered from moderate limitations in her ability to understand

and remember complex instructions and marked limitations in her ability to carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*).

### 2. **T. Inman-Dundon, Psychology**

On May 13, 2010, agency medical consultant Dr. T. Inman-Dundon ("Inman-Dundon") completed a Psychiatric Review Technique. (Tr. 358-71). Inman-Dundon concluded that Dyer's mental impairments did not meet or equal a listed impairment. (*Id.*). According to Inman-Dundon, Dyer suffered from no limitations in her ability to maintain social functioning, mild limitations in her activities of daily living and moderate limitations in her ability to maintain concentration, persistence or pace. (*Id.*). In addition, according to Inman-Dundon, Dyer had not suffered from repeated episodes of deterioration. (*Id.*). Inman-Dundon completed a mental RFC assessment. (Tr. 372-75). Inman-Dundon opined that Dyer suffered from moderate limitations in her ability to understand, remember and carry out detailed instructions. (*Id.*). Inman-Dundon further opined that Dyer had the capacity to perform a job with simple tasks. (*Id.*).

### 3. **Sahler's Opinion**

On November 15, 2010, Sahler wrote a letter in support of Dyer's appeal of the administrative denial of her application for benefits. (Tr. 386-87). Sahler indicated that she was unable to assess Dyer's mental and functional capacity, but believed Dyer's cognitive disabilities would make it difficult for her to find employment that would fully support her. (*Id.*). Sahler recounted Dyer's medical history and opined that she did not suffer from any physical impairments that would restrict her ability to work. (*Id.*). Sahler indicated that she had concerns regarding Dyer's mental capacities and that Dyer had been terminated from two positions due to

her inability to perform at the required pace and to pass a required written evaluation.  (*Id.*).

According to Sahler, Dyer had a significant cognitive impairment that impeded her ability to find

and maintain steady employment.  (*Id.*).  According to Sahler, she believed that Dyer had

impaired judgment, memory and comprehension, and she suggested that Dyer undergo a

neuropsychological evaluation.  (*Id.*).  According to Sahler, the evaluation should test her

executive functioning, including memory, judgment, processing speed and organization, as those

were the areas most affected by her previous injury.  (*Id.*).


III.   **Non-Medical Evidence**

   A.   **Third Party Statements**

Dyer's mother, Surene Shauger ("Shauger"), submitted a letter dated November

3, 2011, in support of Dyer's application for benefits.  (Tr. 285-86).  Shauger indicated that Dyer

previously worked at a hotel and was hired because her aunt was the head housekeeper.  (*Id.*).

According to Shauger, Dyer left that employment because it did not provide health insurance.

(*Id.*).  According to Shauger, Dyer was also previously employed at the General Revenue

Corporation.  (*Id.*).  Shauger indicated that Dyer was placed in a group with the lowest goals due

to her inability to produce at a higher rate.  (*Id.*).  According to Shauger, Dyer's employment was

terminated and, although she was rehired after six months, her employment was again terminated

because she was unable to pass a written employment examination.  (*Id.*).

Shauger opined that Dyer experienced difficulty completing her scheduled shifts

at her current employment due to physical impairments.  (*Id.*).  According to Shauger, Dyer's

current employer would not hire her full-time due to her limited skill level.  (*Id.*).  Shauger also

stated that although Dyer was able to prepare meals, she could only prepare meals "from a box."

(*Id.*).  Additionally, she had difficulty counting money and calculating correct change, which limited her job opportunities.  (*Id.*).  Further, according to Shauger, Dyer would have difficulty with jobs that required her to perform multiple tasks.  (*Id.*).

Dyer's sister, Holly Brooks ("Brooks"), also submitted a letter on Dyer's behalf. (Tr. 280).  Brooks stated that Dyer has difficulty with focus and comprehension.  (*Id.*). According to Brooks, Dyer has trouble keeping employment as a result of her inability to pass written examinations and to maintain an adequate pace.  (*Id.*).  Also, Brooks stated that Dyer would not be able to obtain employment that required her to deal with money or calculate change.  (*Id.*).

Dyer's grandmother submitted a letter stating that Dyer had difficulty obtaining employment due to her slow pace and inability to calculate change or to focus.  (Tr. 281). According to Dyer's grandmother, Dyer is often unable to comprehend and retain what she reads.  (*Id.*).

Dyer's father, Jeffrey K. Childs ("Childs"), submitted a letter dated July 11, 2011. (Tr. 278-79).  Childs indicated that Dyer had struggled at school and continues to experience problems in the work force.  (*Id.*).  According to Childs, Dyer's employment was terminated because she was unable to pass a written aptitude test, even though she was able to adequately perform the requirements of her job.  (*Id.*).  Childs also indicated that although Dyer had passed her driving examination, she was only able to complete the examination because the questions were read to her.  (*Id.*).

Dyer's former teacher, Christine Hall ("Hall"), also submitted a letter. (Tr. 276-77).  According to Hall, Dyer suffered from deficits in expressive language, which

caused her to experience difficulty with communication and comprehension. (*Id.*). According to

Hall, Dyer has difficulty processing sensory information that she sees and hears. (*Id.*).

### B.   **Employment Records**

Dyer's employment records suggest that she requested an accommodation for her

disabilities during her current employment at a department store. (Tr. 270-72). The records

indicate that Dyer was employed in the fitting room and requested an accommodation due to her

traumatic brain injury. (*Id.*). Dyer indicated that she had difficulty counting money, was unable

to operate a cash register and needed some help with computers. (*Id.*). In support of the request,

Sahler completed a form indicating that Dyer was unable to problem solve or work

independently without close supervision, would have difficulty performing jobs that required

speed or mental concentration, and would take longer to train and to perform tasks. (*Id.*).

### C.   **Disability Report**

In her application for benefits, Dyer reported that she had completed the twelfth

grade in a special education class setting and had obtained training in graphic communications.

(Tr. 150). Dyer reported previous employment as a laundry worker at a hotel from 2004 to 2005.

(Tr. 196). She reported that she worked on a full-time basis approximately eight hours a day,

five days a week. (Tr. 151, 172). According to Dyer, she was employed as a loan collector on a

full-time basis from 2005 to 2007. (Tr. 151, 170, 171, 196). In 2007, Dyer returned to her

previous employment as a laundry worker for approximately six months. (Tr. 170, 196). In

2009, Dyer worked for five months as a laundry worker for a different employer. (*Id.*). She also

returned to her previous employment as a debt collector in 2009 for approximately ten months.

(*Id.*). In 2010, Dyer began working at a department store. (Tr. 196).

Dyer reported that she lives with her mother and stepfather and spends her days working part-time, watching television and walking. (Tr. 159-60, 169). She is able to care for her own personal hygiene, prepare simple meals, clean her room and do laundry. (Tr. 161-62). Dyer reported that she has a driver's license and that she leaves her house every day. (Tr. 162). She is able to go shopping, pay bills and manage a savings account. (Tr. 163). Dyer enjoys watching television, bowling, swimming, camping and spending time with others. (Tr. 163-64). According to Dyer, she does not have any problems getting along with others, including her bosses, teachers or the police, and is able to complete tasks and follow written and spoken instructions. (Tr. 164-65). Dyer reported that stress and changes in her schedule cause her to experience headaches and she has difficulty with reading comprehension and counting money. (Tr. 166).

> **D.** **Administrative Hearing**

During the administrative hearing, Dyer testified the she had lived with her parents her entire life. (Tr. 41, 60). She believed that it would be difficult to live on her own because she would have trouble saving money and paying her bills. (Tr. 56-57). Dyer testified that she had graduated from high school with an IEP diploma and that she had obtained her driver's license when she was approximately seventeen years old. (Tr. 41-42). According to Dyer, the questions were read to her. (*Id.*). Dyer testified that she drives every day and that she is able to drive herself to work. (Tr. 42).

Dyer testified that she bought a car with her own money and was responsible for paying for gas and repairs. (Tr. 57). She manages her own money and has a checking account with a debit card and a savings account. (Tr. 49). Dyer testified that she sometimes has problems with over-drafts and with balancing her checkbook. (Tr. 50).

Dyer testified that she began working in the dairy and frozen department at a department store in March 2010.  (Tr. 42-43).  According to Dyer, her duties in that department overwhelmed her and she was unable to keep pace with her coworkers, due in part to her trouble focusing.  (Tr. 52).  As a result, she was transferred to the fitting room in the same store.  (Tr. 43, 52).  Her current duties include opening doors for customers and retrieving returned items. (Tr. 43).

According to Dyer, she does not have any difficulties performing the responsibilities of her current position.  (Tr. 43, 55).  Additionally, she testified that she is able to perform all of the physical requirements of the position.  (Tr. 44).  Dyer indicated that her employer provided her with some accommodations due to her medical impairments.  (Tr. 53-54). According to Dyer, her employer permits her to be absent from work due to some of her physical medical impairments, including migraines.  (Tr. 54).  She testified, however, that her employer requires her to be as productive as her coworkers and to perform the same tasks as the other employees who work in the fitting department.  (Tr. 54, 59).

Dyer testified that she works at the department store approximately twenty-five hours per week and makes approximately $8.10 an hour.  (Tr. 42).  According to Dyer, she works limited hours because she would not be entitled to health insurance if she worked more than that.  (Tr. 44).  Additionally, Dyer testified that she believed that she would be able to work thirty-five to forty hours a week, but that working more hours might be difficult for her to manage.  (Tr. 43).

Dyer testified that she worked for a debt collection agency before the department store.  (Tr. 44).  She worked for the company for approximately two years, but was let go because she did not meet required quotas.  (Tr. 44-45).  Dyer was rehired and performed the job

successfully for approximately six months, but was then terminated because she was unable to successfully pass a required written employment examination. (*Id.*). According to Dyer, the job required her to call individuals who had defaulted on their student loans and to verify certain information, update the company's computer files with any changed information, and read a scripted message to the individuals regarding their loans. (Tr. 45-46). Dyer testified that she performed this job on a full-time basis. (Tr. 47).

Dyer testified that she also had worked as a laundry worker in a hotel. (Tr. 47-48). According to Dyer, she remained in that job for approximately one year and worked approximately thirty-two hours a week at the minimum wage. (Tr. 48). She testified that she had no difficulties performing the requirements of that job and left only because she obtained the job with the collection agency. (*Id.*).

Dyer testified that she is generally able to follow instructions when employed, even if her tasks change from day-to-day, although she prefers to perform the same tasks every day. (Tr. 51). According to Dyer, she performs best with written instructions that are fully explained to her. (*Id.*).

She testified that she does not read often because of her problems with comprehension and focus. (Tr. 55). According to Dyer, she spends her free time bowling, swimming and spending time with her family and friends. (*Id.*). She also goes to the movies, although she sometimes has difficulty focusing through the entire movie. (Tr. 56).

Shauger, Dyer's mother, also testified during the hearing. (Tr. 60-66). Shauger testified that Dyer received health insurance benefits through the Department of Social Services. (Tr. 64). According to Shauger, Dyer's current employer had accommodated Dyer's medical impairments by transferring her to the fitting room after she experienced difficulty performing in

the dairy department at the required pace, providing her assistance with employment tests on the computer and by permitting her to take medical absences.  (Tr. 61-62, 65).  Shauger did not believe that Dyer would be able to work on a full-time basis due to her difficulty with comprehension and her inability to follow written instructions.  (Tr. 63).  Shauger testified that Dyer is able to adequately perform her current job requirements, but Shauger did not believe that Dyer would be able to perform them on a full-time basis.  (Tr. 64-65).

## DISCUSSION

I.   **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

(1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must

consider the record as a whole, examining the evidence submitted by both sides, "because an

analysis of the substantiality of the evidence must also include that which detracts from its

weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v.

Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing

whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry

v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

(1)     whether the claimant is currently engaged in substantial
        gainful activity;

(2)     if not, whether the claimant has any "severe impairment"
        that "significantly limits [the claimant's] physical or mental
        ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
        meets or equals one of the impairments listed in Appendix
        1 of Subpart P of Part 404 of the relevant regulations;

> (4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.     **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 18-27).  Under step one of the process, the ALJ found that Dyer had not engaged in substantial gainful activity since December 4, 2009, the alleged onset date.  (Tr. 20). According to the ALJ, although Dyer had been employed since her alleged onset date, she earned slightly below the level of substantial gainful employment.  (*Id.*).  At step two, the ALJ concluded that Dyer has the severe impairments of status post cardiac arrest with traumatic brain injury, an organic mental impairment with resulting borderline intellectual functioning, and status post treatment for Wilms tumor with no recurrence or metastasis.  (*Id.*).  At step three, the ALJ determined that Dyer does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 21-22).  With respect to Dyer's mental impairments, the ALJ found that Dyer suffered from moderate difficulties in maintaining concentration, persistence or pace, and mild limitations in activities of daily living and maintaining social functioning.  (*Id.*).  The ALJ concluded that Dyer had the RFC to perform

work at all exertional levels, but that she could only understand, remember and carry out simple, one to two-step tasks and could not handle more detailed or complex tasks.  (Tr. 22).  The ALJ concluded that Dyer could otherwise meet the basic mental demands of work activity, including relating to others, persisting at tasks and adapting to routine changes.  (*Id.*).  At step four, the ALJ determined that Dyer was able to perform her past relevant work as a laundry worker and customer service worker.  (Tr. 26).  Accordingly, the ALJ concluded that Dyer is not disabled. (*Id.*).

### B.    Dyer's Contentions

Dyer contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error.  (Docket # 11).  First, Dyer maintains that the ALJ improperly discounted Long's opinion, resulting in an RFC that was not supported by substantial evidence.  (*Id.* at 11-16).  Next, Dyer maintains that the ALJ improperly evaluated her credibility and the credibility of third parties.  (*Id.* at 16-20).  Finally, Dyer maintains that the ALJ's step four determination is not supported by substantial evidence.  (*Id.* at 20-22).

### II.    Analysis

Having carefully reviewed the record, I conclude that the ALJ failed to adequately develop the record concerning the circumstances of Dyer's current and past work history.  This error was not harmless because the ALJ relied heavily on Dyer's current and past work history. Specifically, the ALJ rejected Long's conclusion that Dyer would have difficulty maintaining full-time employment because he found it to be inconsistent with Dyer's past work history. Further, the ALJ cited Dyer's current and prior work history in support of his RFC assessment. Finally, the ALJ's step four determination relied upon Dyer's ability to return to her prior work.

In his decision, the ALJ concluded that Dyer had successfully performed two jobs on a full-time basis and was currently employed in a job that she could perform on that full-time basis.  A careful review of the record, however, reveals that a genuine and material question exists as to whether Dyer has successfully performed any employment position on a full-time, competitive basis without special conditions.  Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Given the significance of Dyer's work history to the ALJ's determination, as discussed below, I conclude that the failure to develop the record concerning her current and prior work history could have affected the ALJ's RFC assessment and the remaining steps of the sequential evaluation, requiring remand.

In his decision, the ALJ relied on Dyer's previous employment as a laundry worker and loan collector[4] and her current employment in a department store.  With respect to Dyer's employment as a loan collector, the ALJ concluded that Dyer had performed "the job successfully over a period of three to four years."  (Tr. 26).  This conclusion is not supported by the record.

The ALJ elicited testimony from Dyer explaining the requirements of the position, which included calling individuals who had defaulted on their loans, updating their personal information and reading from a prepared script.  (Tr. 45-46).  In his decision, the ALJ incorrectly stated that Dyer "successfully perform[ed] the job for at least three years" before being terminated because she was unable to pass a written employment examination.  (*Id.*).

The record demonstrates that Dyer was not able to successfully maintain competitive employment in this position.  Dyer's mother stated that although Dyer was

---

[4] In his decision, the ALJ refers to this employment as a "customer service" job.  (Tr. 26).

employed by the company, she was placed in a group with the lowest productivity goals.

Despite being placed into the lowest performing group, Dyer was unable to satisfy her quota

requirements, resulting in her termination.  (Tr. 45).  According to Dyer, she was rehired after six

months, in accordance with company policy, but ultimately was unable to pass a written

employment examination, leading to her second termination.  (Tr. 45-46).  Thus, the record does

not establish that Dyer was able to perform the requirements of this position, and the ALJ

incorrectly concluded that she successfully maintained this employment on a full-time basis.

In his decision, the ALJ concluded that Dyer was employed as a laundry worker

on a full-time basis and at a substantial gainful activity level.  (Tr. 24, 26).  Yet, the record does

not clearly demonstrate that Dyer performed this position on a full-time basis or at a substantial

gainful level.

In her application for SSI/DIB, Dyer reported that the job required her to place

clothing in a washer and dryer.  (Tr. 172).  She also had to carry laundry into the laundry room.

(*Id.*).  According to Dyer, the position required her frequently to lift and carry up to twenty-five

pounds and did not require her to supervise any other employees.  (*Id.*).  Additionally, Dyer's

application materials suggest that she performed this position on a full-time basis at an hourly

rate of $7.15.  (Tr. 151, 172).

During the hearing, the ALJ elicited minimal testimony from Dyer regarding the

demands of her laundry-work job.  Specifically, the ALJ asked Dyer whether she had had any

trouble performing the demands of the position, and Dyer testified that she had not.  (Tr. 48).

The ALJ also asked her why she had left the job, and she testified that she left only because she

had obtained a new job as a loan collector.  (*Id.*).  The ALJ also asked Dyer whether she had

performed the job on a full-time basis, and she answered in the negative, stating that she had

worked approximately thirty-two hours per week in that position and had received minimum wage.  (*Id.*).  The ALJ did not ask any further questions and did not attempt to resolve the discrepancy between Dyer's testimony and her application.  Despite the clearly conflicting information, the ALJ concluded that Dyer worked as a laundry worker on a full-time basis.  *See May v. Comm'r of Soc. Sec.*, 2011 WL 2473008, *6 (N.D.N.Y. 2011) ("the ALJ has an affirmative due to develop the record; especially when, as in the present matter, a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved") (internal quotations and brackets omitted).

Further, the record was not sufficiently developed to conclude that Dyer performed this job at the level of substantial gainful activity.  Substantial gainful activity is "work activity that is both substantial and gainful."  20 C.F.R. § 404.1572.  Work activity is "substantial" if it "involves doing significant physical or mental activities," and it is "gainful" if it is "the kind of work usually done for pay or profit, whether or not a profit is realized."  *Id.* Work that is done on a part-time basis may be considered substantial.  *See Pickner v. Sullivan*, 985 F.2d 401, 403 (8th Cir. 1993) (citing 20 C.F.R. § 404.1572(a)).

In determining whether a claimant's past relevant work constitutes substantial gainful activity, "primary consideration" should be given to the earnings the claimant derived from the work activity.  20 C.F.R. § 404.1574(a)(1).  The regulations provide earnings guidelines that "set a floor for earnings that presumptively constitute substantial gainful activity."  *See Parker v. Astrue*, 2009 WL 3334341, *3 (N.D.N.Y. 2009).  "Although earnings below the guidelines will 'ordinarily' show that an employee has not engaged in substantial gainful activity, earnings below the guidelines will not conclusively show that any employee has not engaged in substantial gainful activity."  *Pickner v. Sullivan*, 985 F.2d at 403 (citing 20 C.F.R.

§ 404.1574(a)(1)); *see Parker v. Astrue*, 2009 WL 3334341 at *3 ("the ALJ may consider a

claimant's past work, even if the earnings from that work fall below the guidelines").

   The regulations also direct the ALJ to consider whether the work was performed

in a sheltered environment or under special conditions.  20 C.F.R. § 404.1573.  According to the

regulations, under certain circumstances, a person may not have engaged in substantial gainful

activity notwithstanding their wages if the work was done under "special conditions."  20 C.F.R.

§ 404.1573(c).  In such circumstances, "[t]he mere existence of earnings over the statutory

minimum is not dispositive," *Carlson v. Colvin*, 2014 WL 1155617, *2 (E.D. Cal. 2014)

(quoting *Keyes v. Sullivan*, 894 F.2d 1053, 1056 (9th Cir. 1990)), because a person may not be

performing work at the substantial gainful activity level, despite having earnings that exceed the

minimum set forth in the regulations.  *Id.*; *see Caiozzo v. Astrue*, 2012 WL 2921187, *3

(E.D.N.Y. 2012) ("[a]n ALJ may also find that a claimant is disabled notwithstanding [her]

monthly earnings where the work is performed under special conditions").

   The regulations identify specific factors that may suggest that a person is

employed under special or sheltered conditions, including whether an employee:

> (1) require[s] and receive[s] special assistance from other
> employees in performing [the] work;
>
> (2) [is] allowed to work irregular hours or take frequent rest
> periods;
>
> (3) [is] provided with special equipment or [is] assigned work
> especially suited to [the employee's] impairment;
>
> (4) [is] able to work only because of specially arranged
> circumstances, for example, other persons helped [the
> employee] prepare for or get to and from work;
>
> (5) [is] permitted to work at a lower standard of productivity or
> efficiency than other employees; or

> (6)    [is] given the opportunity to work despite [the employee's] impairment because of family relationships, past association with [the] employer, or [the] employer's concern for [the employee's] welfare.

20 C.F.R. § 404.1573(c).

      The parties do not appear to dispute, and indeed Dyer's earning records suggest,[5] that the amount she earned during her employment as a laundry worker exceeded the regulatory threshold level for substantial gainful activity.  (Tr. 134).  However, the record suggests that Dyer obtained this employment because her aunt was the head housekeeper at the hotel that employed Dyer.  (Tr. 285).  The ALJ did not develop the record regarding the circumstances of Dyer's hiring and whether she obtained the job because of her familial relationship to the head housekeeper.  Nor did he develop the record to determine whether any of the other regulatory considerations described above were present, such as, whether Dyer received increased supervision or was subjected to a lower standard of productivity or efficiency than other employees.

      Given the ALJ's substantial reliance on Dyer's work history in weighing the medical opinions, formulating the RFC and rendering his step four determination, coupled with the substantial information in the record to suggest that Dyer might have been employed under special circumstances,[6] I conclude that the ALJ had a duty to further develop the record on this issue.  *See Lynch v. Colvin*, 2014 WL 4370676, *8 (E.D. Cal. 2014) ("[t]he ALJ failed to develop the record with respect to whether plaintiff's past work was sheltered work" where the plaintiff

---

[5]  In 2005, Dyer earned $11,842.00 as a laundry worker – a monthly average of approximately $986.83. (Tr. 134).  In 2005, the regulatory monthly minimum threshold was $830.00.  *See* 20 C.F.R. § 404.1574(b)(2)(i)-(ii); *see also* Social Security Administration Program Operations Manual System ("POMS") DI 10501.015, *available at* *https://secure.ssa.gov/poms.nsf/lnx/0410501015*).

[6]  The possibility that Dyer would require special accommodations in the workplace is well-supported in the record.  In her 2010 opinion, Long opined that Dyer would most likely be successful in a "sheltered workshop" or with specialized job training and accommodations.  (Tr. 344).  Similarly, Sahler expressed her concern that Dyer would have difficulty finding employment that would fully support her.  (Tr. 386-87).

testified that he had only obtained and maintained his employment because his father was an executive with the company).

I reach a similar conclusion with respect to Dyer's current employment at a department store.  The record establishes that Dyer was initially hired into the frozen and dairy section of the department store but was transferred to the fitting room when she was unable to perform at the required pace in the dairy department.  (*Id.*).  During the hearing, Dyer testified that her responsibilities in the fitting room included greeting and opening doors for customers and gathering returned clothing to be restocked.  (Tr. 43).  According to Dyer, she was required to be as productive as the other part-time fitting room employee, but the person who worked in the fitting room on a full-time basis had different tasks to perform.  (Tr. 54, 59).  Dyer and her mother also testified that her current employer provided her special accommodations, including frequent absences and assistance with company tests.  (Tr. 53-54).  Finally, Dyer's mother testified that she was also employed at the same department store.  (Tr. 61).

Although the ALJ concluded that Dyer's current employment was not performed on a full-time basis or at a substantial gainful activity level, he nevertheless concluded that Dyer's ability to sustain her current employment and her testimony that she could perform her current employment on a full-time basis further supported his RFC assessment.  (Tr. 25).  The ALJ correctly recognized that Dyer was transferred after not being able to fulfill the requirements of the position for which she was hired.  (*Id.*).  The ALJ failed, however, to develop any information concerning how Dyer obtained employment at the department store, including whether she was hired because her mother was employed by the company.  Similarly, although the ALJ asked Dyer whether she was expected to be as productive as her coworkers, the record does not establish whether Dyer was transferred to the fitting room because that position was

"especially suited" to her cognitive impairments or whether she "received special assistance" from other employees. *See* 20 C.F.R. § 404.1573(c).  Further information regarding Dyer's current employment would assist the ALJ in determining whether Dyer's current employment permitted her to work under special circumstances, which could affect the consideration he gives her current employment in formulating her RFC.

Additionally, the ALJ mischaracterized and failed to fully explore Dyer's testimony concerning her ability to work at her current job on a full-time basis. (Tr. 25).  The ALJ stated that Dyer testified that she would be able to work on a full-time basis, but his opinion did not note that Dyer immediately clarified her testimony by stating that although she thought she could work more hours, to do so would be "really difficult," require "more understanding" and be "just too much" for her to handle.  (Tr. 43).  Additionally, the ALJ failed to explore Dyer's testimony that the full-time position would require her to perform different tasks and failed to inquire whether Dyer believed she would be able to manage those tasks.

In sum, the ALJ's decision was heavily based upon his conclusions concerning Dyer's previous and current employment.  Of the three jobs discussed by the ALJ, two of them, the hotel and department store jobs, were with companies that also employed Dyer's close relatives and may have constituted employment under special conditions.  The record suggests that Dyer is provided accommodations at the department store, and the ALJ failed to determine whether Dyer was provided any accommodations at the hotel.  As discussed *supra*, the record also contains information that Dyer did not perform either of these jobs on a full-time basis.  The final job relied upon by the ALJ, the loan collector position, does not appear to have been special or sheltered work, and Dyer could not satisfy the requirements because she was unable

(consistent with Long's opinion) to maintain adequate productivity over time and unable to pass the written examination.

The ALJ relied upon Dyer's current and prior work history in evaluating and discounting a portion of Long's 2011 opinion.  An ALJ should consider "all medical opinions received regarding the claimant."  *See Speilberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d)).  In evaluating medical opinions, regardless of their source, the ALJ should consider the following factors:

> (1)    the frequency of examination and length, nature, and extent of the treatment relationship;
>
> (2)    the evidence in support of the physician's opinion;
>
> (3)    the consistency of the opinion with the record as a whole;
>
> (4)    whether the opinion is from a specialist; and
>
> (5)    whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Speilberg v. Barnhart*, 367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources, state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

In her 2011 evaluation, Long noted that Dyer's functioning tended to deteriorate over time and with increased stress.  (Tr. 551).  According to Long, Dyer reported that she could manage the requirements of her current job, but felt that full-time employment would cause her comprehension difficulties and frustration.  (Tr. 550).  Based upon this information, Long concluded that any increase in stress level or work volume could negatively affect Dyer's

cognitive functioning.  (*Id.*).  Long also opined that Dyer would be able to follow, understand

and perform simple tasks, maintain attention and concentration, maintain a regular schedule and

learn new tasks.  (*Id.*).

> The ALJ considered Long's 2011 opinion and accepted her conclusions that Dyer

was able to understand, remember and carry out instructions and could relate to others.  (Tr. 26).

The ALJ gave little weight to Long's conclusion that Dyer would have difficulty persisting at

tasks over time on the grounds that the opinion was contradicted by Dyer's work history.  (*Id.*).

According to the ALJ, Dyer's work history demonstrated that she had obtained at least two

"full-time" jobs that she performed at a level of substantial gainful activity and that "she was

able to do them successfully over time."  (Tr. 24-25). Yet, as discussed above, the record does

not support this conclusion.  For this reason, I conclude that the ALJ failed to provide adequate

reasons for rejecting Long's conclusion, and remand is appropriate for the ALJ to further

develop the record and to re-evaluate Long's opinion based upon the record as a whole.  *See*

*Ernst v. Colvin*, 2015 WL 525503, *2 (9th Cir. 2015) (ALJ improperly discounted medical

opinion that claimant was incapable of performing competitive work on a sustained basis

because it was inconsistent with claimant's prior work history where evidence demonstrated that

claimant was only capable of sustaining employment in a sheltered environment); *Lester v.*

*Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995) ("the opinion of an examining doctor . . . can only

be rejected for specific and legitimate reasons that are supported by substantial evidence").

> The ALJ's unsupported conclusions regarding Dyer's current and prior work

history likely also infected his credibility determination and his RFC assessment.  Moreover, the

ALJ explicitly relied upon Dyer's prior work history in concluding that she could return to her

previous position as a loan collector and a laundry worker.  The ALJ's conclusion that Dyer

could perform the requirements of her position as loan collector is refuted by the record. Further, the ALJ failed to adequately develop the facts necessary to conclude that Dyer's prior work as a laundry worker was performed at a substantial gainful level. *See Summers v. Colvin*, 2014 WL 5312896, *14 (D.S.C. 2014) (court was unable to conclude that ALJ's step four determination was supported by substantial evidence where the record contained evidence suggesting that the plaintiff's prior work was in a sheltered or special environment and the ALJ "only considered the amount of [p]laintiff's earnings and ignored the provisions in 20 C.F.R. § 404.1574(b), which required that he consider whether [p]laintiff's wages were being subsidized"); *Lynch v. Colvin*, 2014 WL 4370676 at *7-8 ("[d]isability hearings are not adversarial" and the ALJ failed to develop the record by inquiring whether "plaintiff's past work with [company in which his father was an executive] was performed at a lower standard of productivity or efficiency than other employees, whether he was given special assistance from other employees, or whether he was given the opportunity to continue working there despite his frequent absences"); *Wright v. Colvin*, 2013 WL 6734292, *8 (D.N.J. 2013) (ALJ improperly concluded that plaintiff was engaged in substantial gainful activity without considering whether she was employed under special conditions where testimony suggested that she was permitted to work irregular hours with frequent breaks and where she was friends with the executive director of the organization); *Manning v. Comm'r of Soc. Sec.*, 2009 WL 243014, *5 (S.D. Ohio 2009) (ALJ improperly concluded that plaintiff's past work constituted substantial gainful activity where ALJ failed to consider the circumstances of plaintiff's prior employment, including the fact that most of his jobs were apparently procured through family or other close relationships). Accordingly, I conclude that remand is appropriate to permit further development of the record and to allow the

ALJ to consider the additional information in evaluating the third party statements and Dyer's credibility, RFC and ability to perform her previous work.

On remand, the ALJ should develop the record concerning the circumstances of Dyer's current and past employment, should explore whether Dyer's current or previous positions were performed under "special conditions" within the meaning of the regulations, and clarify whether her position as a laundry worker was performed on a full-time basis. Additionally, the ALJ should reevaluate Long's opinion, and consider recontacting her, in light of the better-developed record.  On remand, the ALJ should specifically consider whether Dyer "is capable of performing sustained, competitive work outside of sheltered environments."  *See Ernst v. Colvin*, 2015 WL 525503 at *2.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 9)** is **DENIED**, and Dyer's motion for judgment on the pleadings **(Docket # 10)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
         March 30, 2015